UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

AT BECKLEY

UNITED STATES OF AMERICA

v.                                                    CRIMINAL ACTION NO. 5:25-cr-00058

PAUL JEREMIAH BUCKNER

**MEMORANDUM OPINION AND ORDER**

Pending is Defendant Paul Jeremiah Buckner's Motion to Suppress Evidence [ECF 25], filed June 30, 2025. The Government responded in opposition on July 15, 2025. [ECF 29]. The Court held an evidentiary hearing on July 22, 2025, at which Park Service Rangers Logan Hartsog and Adam Brown testified. [ECF 40]. Thereafter, the Court directed the parties to file post-hearing briefs. [ECF 41]. The parties filed additional briefing on August 12, 2025. [ECF 49, 50]. Mr. Buckner replied on August 13, 2025. [ECF 51]. The matter is ready for adjudication.

**I.**

At 1:09 p.m. on October 7, 2024, while on patrol within the boundaries of the New River Gorge National Park and Preserve, rangers Hartsog and Brown observed the erratic operation of a Chevrolet Silverado with an expired registration sticker. [ECF 48 at 6, 35]. Specifically, Ranger Brown testified that the vehicle was "weaving in and out of the traffic lane" and used the wrong turn signal. [ECF 48 at 9]. Ranger Brown "ran the registration through the dispatch and . . . it came back as not on file." [*Id.* at 6]. Ranger Brown also discovered the license plate was unregistered. [ECF 25 Ex. A at 1:24]. The rangers initiated a traffic stop. [ECF 48 at 7–8; *see* ECF 25 Ex. A]. There were four adults in the vehicle, including Johnathan Cummings, the driver;

Harmony Waters, a front passenger and the owner of the vehicle; and Desirae Maynor and Mr. Buckner, both passengers in the rear of the vehicle. [ECF 48 at 32, 37; ECF 25 Ex. A].

Ranger Brown testified "the driver . . . seemed pretty nervous," "[h]e had red glassy eyes, very constricted pupils[,] [a]nd then there was a bit of tooth decay. And then I did see some wounds on their arms." [*Id.* at 8]. Ranger Brown further testified the observations were "indicative of drug use." [*Id.*]. Ranger Hartsog's bodycam footage reflects the rangers approached the vehicle, notified the driver of the reason for the stop, [Ex. A at 1:13–1:26 ("[The] registration's out . . . [and] the plate doesn't come back as registered.")], and obtained the driver's license and the vehicle's registration, [*id.* at 2:00–2:30]. The rangers then walked to the rear of the vehicle. Ranger Hartsog explained to Ranger Brown, "I want to talk to him a bit. He looks like -- his eyes looked a little messed up. So does hers . . . . Her eyes looked messed up like maybe she's been using." [*Id.* at 2:46–2:56]. While Ranger Brown requested the dispatch officer to conduct a check on the driver, [*id.* at 3:12], Ranger Hartsog requested the driver exit the vehicle for "additional info." [*Id.* at 3:12–3:19].

The driver consented to a search of his person. [*Id.* at 4:03–4:08 (Ranger Hartsog: "Is it okay if he searches you real quick?" Driver: "Yeah I don't got nothing.")]. Ranger Hartsog received a radio confirmation the driver's license was valid, [*id.* at 4:45], after which Ranger Brown began the consent search. [*Id.* at 4:26]. Ranger Brown discovered a straw and lighter in the driver's pocket, which the driver stated was "from a couple days ago" when he used it for "smoking dabs [of] . . . marijuana" [*Id.* at 5:24–38]. Thereafter, the following exchange occurred:

> Ranger Hartsog: I notice you got your dabs here. Is there anything in the truck?
> Driver: No. I don't—I don't got nothing . . . .
> Ranger Hartsog: Do they got anything?
> Driver: I don't know. If they do they ain't been sharing.
> Ranger Brown: They ain't sharing with you?
> Driver: I'm pretty sure we're all good.

>Ranger Hartsog: Okay they ain't been sharing.
>Driver: No we just—we don't—
>Ranger Hartsog: Is there any weed in the truck?
>Driver: No. We don't got nothing.
>Ranger Hartsog: Anybody smoke weed in the truck recently?
>Driver: We's—no.
>Ranger Hartsog: Any meth?
>Driver: No. They [sic] ain't no drugs in there.

[*Id.* at 6:47–7:13].

Next, Ranger Hartsog requested Ms. Waters exit the vehicle. [*Id.* at 7:50]. As she exited the vehicle, Ranger Hartsog witnessed burnt foil in the door of the vehicle. [*Id.* at 8:10; ECF 48 at 40 ("[T]here was a piece of foil in the door and it had black burn marks on it . . . indicative of somebody maybe smoking a substance off the tin foil. That's common with methamphetamine use.")]. The following exchange occurred:

>Ranger Hartsog: Some foil, burnt foil there? What's that called? . . . Ma'am? What's that burnt foil from?
>Ms. Waters: It's—it's old. It was left in there.
>Ranger Hartsog: From smoking meth?
>Ms. Waters: Mmhmm.
>Ranger Hartsog: Okay.
>Ms. Waters: But there's no—I have no drug or—it's old, it really is. I promise you it is.
>Ranger Hartsog: Okay. Is there any other drugs in the vehicle?
>Ms. Waters: No.
>Ranger Hartsog: No?
>Ms. Waters: No. I'm—I'm—you can look in my purse and everything. I promise there's not.
>Ranger Hartsog: I'm not judging you personally if there is but—
>Ms. Waters: There's not.
>Ranger Hartsog: I've seen some signs of drug use, like, uh, like your guys's eyes. When was the last time you've used?
>Ms. Waters: Probably last night.
>Ranger Hartsog: Okay. Heroin?
>Ms. Waters: (Nods head).
>Ranger Hartsog: Probably meth yesterday or this morning?
>Ms. Waters: Probably yesterday.
>Ranger Hartsog: What about him—
>Ms. Waters: I'm not real sure.

3

[Ex. A at 8:10–9:05].

While Ranger Brown conducted a consent search of Ms. Waters, [*id.* at 10:20 (Ranger Hartsog: "Is it okay if he searches you real quick"? Ms. Waters: "Yeah.")], and immediately after Ranger Hartsog requested the dispatch officer to conduct a check on Ms. Waters, [*id.* at 10:58], the rangers observed suspicious movement in the truck's cab. [ECF 48 at 41 ("[W]hile the consent search was going on with Ms. Waters I saw the passenger who was sitting in the backseat, the male passenger, . . . stuffing an object behind the seat. . . . [S]o, I believed at that time that I had probable cause to conduct a vehicle search. I was worried that somebody was stuffing, you know, possible contraband or a possible weapon behind the seat.")]. Ranger Hartsog went to investigate. [Ex. A at 11:22–11:50 (Ranger Hartsog: "What's he doin'? What is he doing? . . . What are you doing man? . . . We thought you was stuffing something back there." Mr. Buckner: "No.")]. Subsequently, Mr. Buckner exited the vehicle and consented to a search of his person. [*Id.* at 11:58 (Ranger Hartsog: "Is it okay if he searches you real quick?" Mr. Buckner: "Yeah yeah yeah yeah yeah cool cool cool cool.")]. While Ranger Brown conducted the search, the following exchange occurred:

> Ranger Hartsog: What was you stuffing back there?
> Mr. Buckner: Huh?
> Ranger Hartsog: What was you stuffing back there?
> Mr. Buckner: Nothing . . . [unintelligible].
> Ranger Hartsog: What am I gonna find back there?
> Mr. Buckner: You're going to find nothing back there.
> Ranger Hartsog: All right, man.
> Mr. Buckner: I mean, as far as the truck goes I don't know. I ain't got nothing. I don't even—
> Ranger Hartsog: Is there anything illegal in the truck, drugs?
> Mr. Buckner: (Shakes head and makes hand-shrug-gesture)
>  . . .
> Ranger Hartsog: You gotta chill, man. So, man, listen. We gotta search the car. What are we going to find?
> Mr. Buckner: Ain't my truck, man. I mean you're not going to find nothing illegal in it, as far as I know. They just picked me up.

Ranger Hartsog: We'll see what I do find.

[*Id.* at 11:58–15:27].

Ranger Hartsog then requested the dispatch officer check the name Andrew Warrick, the title Mr. Buckner used to identify himself to the rangers. [*Id.* at 15:42–16:15]. Thereafter, Ranger Hartsog retrieved the fourth passenger from the vehicle, Desirae Maynor. The following exchange occurred:

Ranger Hartsog: What was he doing?
Desirae Maynor: He was really, he was touching my face like this. (gestures).
Ranger Hartsog: He looked like he—now I saw him reach behind there. What are we going to find behind that seat there? I'm gonna check it.
Desirae Maynor: Okay you can. I didn't see him do nothing like that.
Ranger Hartsog: Okay. So. Okay. So obviously we're going to check the car, there's burnt foil with meth residue on it. . . .
Desirae Maynor: Okay.
Ranger Hartsog: What are we going to find in there?
Desirae Maynor: I don't know—I don't do drugs or anything.
Ranger Hartsog: You don't know what we're going to find?
Desirae Maynor: No. I was just riding with him.
Ranger Hartsog: You look like—your eyes—all of y'all look like you're users.

[*Id.* at 17:15–17:49].

Ranger Brown conducted a consent search of Ms. Maynor. [*Id.* at 19:02 (Ranger Hartsog: "Do you got any guns on you? Any weapons? Is it okay if he searches you real quick to make sure?" Ms. Maynor: "Yeah.")]. Ranger Hartsog then began to search the vehicle. [Ex. A at 19:43]. Ranger Brown and Ranger Luke Johnson joined in the vehicle search. The rangers recovered a Taurus TCP .380 pistol from under the rear seat of the vehicle. [*Id.* at 49:36]. Ranger Brown provided Mr. Buckner with warnings pursuant to *Miranda v. Arizona*, 384 U.S. 436 (1966). [*Id.* at 52:23]. Less than two minutes later, Ranger Hartsog returned to speak to Mr. Buckner. The following exchange occurred:

5

Mr. Buckner: Ya'll asked was there . . . any weapons in the car and my girlfriend forgot she had a pistol . . . so I threw it in the back . . . It's not stolen. It's none of that shit—
Ranger Hartsog: So, you stuffed the pistol in the back?
Mr. Buckner: Yeah, I did that. It's just cause cause she was scared because she forgot it was in her purse. . . .
. . .
Ranger Hartsog: So, you had the pistol?
Mr. Buckner: No, she had it in her purse.
Ranger Hartsog: And she gave it to you?
Mr. Buckner: Yeah.
Ranger Hartsog: And you stuffed the pistol—
Mr. Buckner: Yeah
Ranger Hartsog: Down the back—
Mr. Buckner: Yeah.

[*Id.* at 54:15–55:02].

Mr. Buckner is charged in a single-count indictment with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8). He moves to suppress (1) the Taurus TCP .380 pistol, and (2) the incriminating remarks made to Ranger Hartsog.

## II.

When deciding a motion to suppress, the district court is generally obligated to make findings of fact and conclusions of law. *United States v. Stevenson*, 396 F.3d 538, 541 (4th Cir. 2005). *See also Columbus–Am. Discovery Grp. v. Atl. Mut. Ins. Co.*, 56 F.3d 556, 567 (4th Cir. 1995) ("[I]n the usual case, the factfinder is in a better position to make judgments about the reliability of some forms of evidence than a reviewing body acting solely on the basis of a written record of that evidence. Evaluation of the credibility of a live witness is the most obvious example.") (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Tr. for S. Cal.*, 508 U.S. 602, 623 (1993)). "The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or

seizure." *Rakas v. Illinois*, 439 U.S. 128, 132 (1978). *See also United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981).

The Court notes at the outset that Rangers Hartsog and Brown are deemed entirely trustworthy and credible. Both rangers testified in a straightforward and responsive manner free of hesitation. The testimony was detailed, internally consistent, and mutually corroborative. Significantly, their accounts aligned precisely with the contemporaneous video footage, which provides an objective record of the traffic stop and the ensuing events. The bodycam footage confirms, for example, their observations of the driver's physical condition, the burnt foil discovered in the passenger door, the suspicious movements of Mr. Buckner in the rear seat, and ultimately the recovery of a firearm from beneath the seat.

The rangers' testimony was further corroborated by the vehicle occupants' admissions, including Ms. Waters' acknowledgment of recent heroin and methamphetamine use and Mr. Buckner's admission that he concealed the firearm. Such independent admissions bolster the accuracy of the rangers' observations and dispel any suggestion of embellishment. The Court also notes that the rangers' testimony reflects their training and experience in recognizing signs of narcotics use, and their inferences were both reasonable and consistent with the circumstances observed.

Finally, there is no evidence even hinting that the rangers harbored bias or motive to fabricate their testimony. On the contrary, their testimony reflected the observations of law enforcement officers performing routine patrol duties. Considering the demeanor of the witnesses, the consistency of their testimony, the corroboration provided by bodycam footage and admissions from the occupants, and the plausibility of their accounts in light of the surrounding circumstances, the Court concludes that Rangers Hartsog and Brown testified credibly in all material respects.

### III.

*A. The Traffic Stop*

### 1. Governing Standard

The Fourth Amendment ensures that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." U.S. Const. amend. IV. A seizure occurs when an officer employs "'physical force' or a 'show of authority' that 'in some way restrain[s] the liberty' of the person." *Torres v. Madrid*, 592 U.S. 306, 311 (2021) (quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968)). "Seizures of persons generally must be supported by probable cause." *United States v. Perry*, 92 F.4th 500, 509 (2024) (citing *Dunaway v. New York*, 442 U.S. 200, 208–09 (1979)). Nevertheless, "[i]n *Terry v. Ohio*, the Supreme Court recognized that the police may constitutionally "conduct a brief, investigatory stop when [an] officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *Perry*, 92 F.4th at 509 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (discussing *Terry v. Ohio*, 392 U.S. 1, 30 (1968))). Whether an officer has reasonable suspicion to conduct an investigatory stop is an objective inquiry. *See id.*; *United States v. Bowman*, 884 F.3d 200, 213 (4th Cir. 2018) (quoting *United States v. Branch*, 537 F.3d 328, 340 (4th Cir. 2008) ("In reviewing police action, courts must look at whether the evidence as a whole establishes reasonable suspicion rather than whether each fact has been individually refuted, remaining mindful of 'the practical experience of officers who observe on a daily basis what transpires on the street.'")). Reasonableness "is measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 39 (1996).

The Fourth Amendment's protection against unreasonable seizures extends to traffic stops, which are reviewed under the standard articulated in *Terry*. *Rodriguez v. United*

*States*, 575 U.S. 348, 354 (2015); *United States v. Perez*, 30 F.4th 369, 374 (4th Cir. 2022); *United States v. Bowman*, 884 F.3d 200, 209 (4th Cir. 2018). Pursuant to the standard articulated in *Terry*, a traffic stop is reasonable if (1) the stop was "legitimate at its inception," and (2) the officer's actions were "reasonably related in scope to the basis for the traffic stop." *Bowman*, 884 F.3d at 209 (quoting *United States v. Hill*, 852 F.3d 377, 381 (4th Cir. 2017); *United States v. Williams*, 808 F.3d 238, 245 (4th Cir. 2015)). "[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." *Rodriguez v. United States*, 575 U.S. 348, 350 (2015).

"A seizure justified only by a police-observed traffic violation, therefore, 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a ticket for the violation." *Id.* at 350–51 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). Nevertheless, an officer may "prolong a traffic stop beyond the scope of a routine traffic stop, [where the] officer . . . possess[es] a justification for doing so other than the initial traffic violation." *Perez*, 30 F.4th at 375 (quoting *United States v. Guijon-Ortiz*, 660 F.3d 757, 764 (4th Cir. 2011)) (cleaned up). Therefore, an unrelated investigation may extend the duration of the stop where (1) those detained provide consent, or (2) the officer has reasonable suspicion of criminal activity. *Id.* (citing *United States v. Hill*, 852 F.3d 377, 382 (4th Cir. 2017)).

Reasonable suspicion requires an officer to "offer specific and articulable facts that demonstrate at least a minimal level of objective justification for the belief that criminal activity is afoot." *United States v. Branch*, 537 F.3d 328, 337 (4th Cir. 2008) (internal citations and quotations omitted). This standard is viewed in the totality of the circumstances. *Hill*, 852 F.3d at 381. "[C]ourts must look at whether the evidence as a whole establishes reasonable suspicion rather than whether each fact has been individually refuted, remaining mindful of 'the practical

experience of officers who observe on a daily basis what transpires on the street.'" *Bowman*, 884 F.3d at 213 (quoting *Branch*, 537 F.3d at 336–37)). "[F]actors which by themselves suggest only innocent conduct may amount to reasonable suspicion when taken together." *Torres v. Ball*, No. 21-6447, 2023 WL 2966035, at *5 (4th Cir. Apr. 17, 2023) (quoting *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004)).

   "Detention of passengers during a traffic stop provides the basis for them to challenge the legality of the stop under the Fourth Amendment." *United States v. McGee*, 736 F.3d 263, 269–70 (4th Cir. 2013) (quoting *Brendlin v. California*, 551 U.S. 249, 256–63 (2007)).

   "When police violate the Fourth Amendment's prohibition on unreasonable searches and seizures, the government may be forbidden from using the improperly obtained evidence at trial." *United States v. Villa*, 70 F.4th 704, 716 (4th Cir. 2023) (citing *Herring v. United States*, 555 U.S. 135, 140–42 (2009)). Accordingly, evidence obtained through unlawful conduct may be excluded inasmuch as it is the "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471 (1963).

## 2. The Parties' Contentions

   Relying on *Rodriguez*, 575 U.S. at 350, and its progeny, Mr. Buckner primarily contends the Taurus TCP .380 pistol should be suppressed because Ranger Hartsog unwarrantedly deviated "from completing a traffic stop for motor vehicle registration violations in order to pursue an unsupported investigation as to whether there were any drugs in the truck," [ECF 26 at 1], which Mr. Buckner contends was a violation of his Fourth Amendment rights. [*Id.* at 11; ECF 49 at 5–8]. He further asserts his incriminating statements should be suppressed inasmuch as they constitute fruit of the poisonous tree. [ECF 25 at 13].

The Government responds the rangers' initial actions -- requesting the driver and front passenger exit the vehicle and for consent to a pat down search -- were "reasonably related in scope to the basis for the stop." [ECF 29 at 5–6]. It further asserts the visible drug paraphernalia and Mr. Buckner's furtive movements to conceal an object within the vehicle provided reasonable suspicion that criminal activity was afoot. [*Id.*] Therefore, the Government urges the Motion to Suppress be denied.

### 3. Legality of the Stop

The Court first notes that, as a passenger in the vehicle, Mr. Buckner may challenge the legality of the stop under the Fourth Amendment. *McGee*, 736 F.3d at 269–70.

The traffic stop was plainly legitimate at its inception inasmuch as the vehicle had an expired registration, which is a violation of state law. [*See* ECF 29 at 3 (citing W. Va. Code §17A-3-16)]. *See Bowman*, 884 F.3d at 209. Moreover, the rangers' initial actions -- *i.e.*, checking the driver's license and determining whether there were any outstanding warrants against the driver -- were "reasonably related in scope to the basis for the traffic stop." *Id.* (citation omitted). It is true officers may not perform traffic stops "'in a deliberately slow or inefficient manner . . . in order to expand a criminal investigation within the temporal confines of the stop.'" *United States v. Joseph*, 138 F.4th 797, 804 (4th Cir. 2025) (quoting *Hill*, 852 F.3d at 384). That is not what happened here. Instead, the rangers took permissible actions -- *i.e.*, asking passengers to step out of the vehicle, *Maryland v. Wilson,* 519 U.S. 408, 413–415 (1997) (concluding passengers may be required to exit vehicle stopped for traffic violation); *Rodriguez*, 575 U.S. at 356 (quoting *Pennsylvania v. Mimms,* 434 U.S. 106 (1977)) (*per curiam*) ("[T]he government's 'legitimate and weighty' interest in officer safety outweighs the '*de minimis*' additional intrusion of requiring a driver, already lawfully stopped, to exit the vehicle."), and conducting valid consent searches of

those passengers, *see United States v. Alvarado Dubon*, 135 F.4th 202, 205 (4th Cir. 2025) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226−27 (1973)) -- after the initial seizure that increased rather than dispelled their reasonable suspicions.

With respect to the first purported delay, Ranger Brown requested the dispatch officer conduct a check on the driver within one minute of obtaining his license, [*compare id.* at 2:28 (driver hands Ranger Brown his driver's license), *with id.* at 3:12 (Ranger Brown requested the dispatch officer to conduct a check)], and the driver consented to a search of his person while the rangers were waiting to hear from dispatch regarding the driver's record, [*id.* at 4:05]. Yet, less than two minutes later, Ranger Brown discovered a straw and lighter in the driver's pocket during the consent search, which the driver readily admitted was "from a couple days ago" when he used it for "smoking dabs [of] . . . marijuana." [*Id.* at 5:24–5:38]. Furthermore, while Ranger Hartsog received radio confirmation the driver had a clean record after the consent search began, [*id.* at 4:45], the receipt of confirmation did not require the consent search be concluded as Mr. Buckner implies. In fact, the discovery of admitted drug paraphernalia on the driver's person provided not only reasonable suspicion of criminal activity -- it provided rangers with probable cause by supporting a "fair probability that contraband or evidence of [drug use would] be found" in the vehicle. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). *See United States v. Alston*, 941 F.3d 132, 138 (4th Cir. 2019) (cleaned up) (recognizing "[a]n officer's detection of marijuana creates . . . probable cause"); *United States v. Davis*, 94 F.4th 310, 320 (4th Cir. 2024) (quoting *United States v. Runner*, 43 F.4th 417, 422–23 (4th Cir. 2022) (collecting cases)) ("'A pipe alone would not necessarily trigger the plain view exception' [without] additional evidence linking the pipe to criminal use to establish probable cause."). This is particularly so combined with the rangers' previous observations of the driver and front passengers' eyes indicating drug use. [Ex. A

at 2:46–2:56 ("He looks like -- his eyes looked a little messed up. So does hers. . . . Her eyes looked messed up like maybe she's been using."); ECF 48 at 8 (Testimony of Ranger Brown regarding the driver's "red glassy eyes, very constricted pupils[,] . . . tooth decay[,] [and] wounds on their arms," which were "indicative of drug use.")].

Although Mr. Buckner asserts the stop "became unduly prolonged in violation of his Fourth Amendment rights" before the search of the driver, [ECF 49 at 6], this contention both ignores (1) the valid, consensual nature of the search, and (2) the discovery of admitted drug paraphernalia on the driver's person. Mr. Buckner's further arguments rely heavily on *Rodriguez*, 575 U.S. at 356, which is inapposite. Specifically, Mr. Buckner further faults: (1) the time that it took the rangers to conduct the stop, (2) Ranger Hartsog's "delay [in] resolving the identified registration issues with the truck in order to pursue an unsubstantiated hunch that there was a stash of drugs in the truck," (3) the fact that no citations were written "until the search of the truck had been completed which was at least an hour after the beginning of the stop," and (4) Ranger Hartsog's "deviat[ions] from . . . standard procedure" by requesting the passengers exit the vehicle and asking questions related to drug use of the passengers while awaiting responses from dispatch. [*Id.* at 5–6].

In contrast to *Rodriguez*, however, the prolonged seizure was not "justified *only* by a police-observed traffic violation." 575 U.S. at 350 (emphasis added). Instead, it was frankly warranted by ample reasonable suspicion for the rangers to conduct an investigation into the passengers' drug use inasmuch as the discovery of the admitted drug paraphernalia gave rise to probable cause. In *Perez*, our Court of Appeals recognized an officer may "prolong a traffic stop beyond the scope of a routine traffic stop, [where the] officer . . . possess[es] a justification for doing so other than the initial traffic violation." 30 F.4th at 375 (citing *Hill*, 852 F.3d at 382).

With respect to the second purported delay, a mere eight minutes had elapsed when Ranger Hartsog asked Ms. Waters to exit the vehicle, and he witnessed in plain view further evidence of drug paraphernalia in the vehicle. [Ex. A at 8:10 (Ranger Hartsog: "What's that burnt foil from?" Ms. Waters: "It's—it's old. It was left in there." Ranger Hartsog: "From smoking meth?" Ms. Waters: "Mmhmm"); ECF 48 at 40 (Ranger Hartsog testified "there was a piece of foil in the door and it had black burn marks on it . . . indicative of somebody maybe smoking a substance off the tin foil. That's common with methamphetamine use.")]. The presence of additional admitted drug paraphernalia in plain view amounted to further probable cause to believe that evidence of criminal activity would be found in the vehicle.

Further, while conducting the consent search of Ms. Waters, the rangers witnessed, through the Silverado's back window, Mr. Buckner "stuffing an object behind the seat" which Ranger Hartsog testified he believed was "possible contraband or a possible weapon." [ECF 48 at 41–42]. The testimony is supported by the bodycam footage. [Ex. A at 11:22–11:50 (Ranger Hartsog: "What's he doin'? What is he doing? . . . What are you doing man? . . . We thought you was stuffing something back there." Mr. Buckner: "No.")]. Although the validity of the extended stop has been established, Mr. Buckner's actions serve to further underscore the validity of the prolonged stop.

## B. The Vehicle Search

### 1. The Parties' Contentions

Counsel have not discussed at any length whether the search of the vehicle was supported by probable cause. Mr. Buckner's Motion to Suppress, however, makes brief mention of the validity of the vehicle search within its argument that the traffic stop was unlawfully

14

extended. [*See* ECF 25 at 13 ("The burnt foil that was reported being observed by [Ranger] Hartsog would not have provided probable cause to initiate a search of the car for drugs.").

## 2. Governing Standard

"'Under the Fourth Amendment, law enforcement officers are generally required to obtain a warrant before conducting a search.'" *United States v. Caldwell*, 7 F.4th 191, 200 (4th Cir. 2021) (quoting *Maryland v. Dyson*, 527 U.S. 465, 466 (1999) (*per curiam*)). Nevertheless, the automobile exception to the warrant requirement permits police officers to conduct a search of a vehicle where it is "readily mobile and probable cause exists to believe it contains contraband." *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (*per curiam*) (citing *California v. Carney*, 471 U.S. 386, 393 (1985)). *See also Caldwell*, 7 F.4th 191, 200 (4th Cir. 2021) (concluding pursuant to the automobile exception that probable cause to believe a vehicle contains contraband justifies "a warrantless search"). Probable cause requires a "fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. "[O]nce police have probable cause, they may search 'every part of the vehicle and its contents that may conceal the object of the search.'" *United States v. Kelly*, 592 F.3d 586, 590 (4th Cir. 2010) (quoting *United States v. Ross*, 456 U.S. 798, 825 (1982)). *See also Caldwell*, 7 F.4th at 200 (quoting *Ross*, 456 U.S. at 825) ("[W]here the automobile exception applies, 'it justifies the search of every part of the vehicle.'").

## 3. Legality of the Vehicle Search

The Court's factual findings adequately support the conclusion that the rangers had probable cause to conduct a warrantless search of the vehicle pursuant to the automobile exception. *See Kelly*, 592 F.3d at 590 (quoting *Ross*, 456 U.S. at 825) ("[O]nce police have probable cause, they may search 'every part of the vehicle and its contents that may conceal the object of the search.'"); *Caldwell*, 7 F.4th at 200 (quoting *Ross*, 456 U.S. at 825) ("[W]here the automobile

exception applies, 'it justifies the search of every part of the vehicle.'"). After witnessing the passengers, who displayed symptomology of drug use, and discovering admitted drug paraphernalia on the driver's person during the consent search as well as within plain view in the door of the vehicle, the rangers possessed probable cause to search the vehicle for evidence of drugs.

**IV.**

Accordingly, the Court **DENIES** Mr. Buckner's Motion to Suppress [**ECF 25**].

The Court **DIRECTS** the Clerk to transmit a copy of this written opinion and order to the Defendant and his counsel, the United States Attorney, the United States Probation Officer, and the United States Marshal Service.

ENTER:  September 11, 2025

Frank W. Volk
Chief United States District Judge